In the Matter of JOHN F. FAY et al., Petitioners, v EDWARD REGAN, as Comptroller of the State of New York, et al., Respondents.

Third Department, December 8, 1983

APPEARANCES OF COUNSEL

*Lombardi, Reinhard, Walsh & Harrison, P. C. (Richard P. Walsh, Jr.,* and *Michael T. McGarry* of counsel), for petitioners.

*Robert Abrams, Attorney-General (Peter G. Crary* and *William J. Kogan* of counsel), for respondents.

**OPINION OF THE COURT**

KANE, J. P.

The facts of this case are not disputed. Petitioners Oscar Awe and John Fay have been harness racing judges in the State of New York since 1954 and 1956, respectively. Both petitioners submitted applications to the State Harness Racing Commission (commission) to become racing judges.

Petitioner Fay was interviewed by the commissioner and petitioner Awe was interviewed by the deputy commissioner. Following their interviews, each petitioner was sent a letter of appointment by the commissioner and was directed to report to a specific racetrack at a certain date and time. Additionally, the commission notified petitioners of their salaries. Before petitioners were allowed to begin their work as racing judges, they took an oath, administered by officials of the commission, in which they pledged to uphold the rules and regulations of the commission. Petitioners were also given a list of duties which were detailed in the commission's rules and regulations book.

During the time that petitioners acted as racing judges, the commission set their salary and sent petitioners to various tracks around the State. When petitioners arrived at said racetracks, they reported to commission officials. Furthermore, at these racetracks, petitioners were required to wear identification badges identifying them as State racing officials. Petitioners were also required to attend annual seminars which were conducted exclusively for State officials. Moreover, when appeals were taken from decisions made by petitioners, counsel from the commission would represent petitioners.

Although the commission always had the afore-mentioned relationship with petitioners while they acted as racing judges, prior to April 1, 1966, petitioners' compensation checks were issued by the individual track associations to which the commission had assigned them. Commencing on April 1, 1966, however, petitioners were paid their salaries directly by the State of New York. The change took effect because former 19 NYCRR 85.4 (b) was amended to require the State to directly issue petitioners' compensation checks and to require the individual track associations to reimburse the State for these funds.* At this time, petitioners completed a written application for membership in the New York State Employees' Retirement

---

\* As of April 1, 1966, former 19 NYCRR 85.4 (b) (now 9 NYCRR 4105.4) provided: "The compensation of all State racing officials, except the State veterinarians, shall be fixed by the commission and shall be paid by the State to be reimbursed by assessment against each racing association or corporation in an amount to be fixed by the State Harness Racing Commission \* \* \* and shall be paid as directed by the State Harness Racing Commission".

System giving April 1, 1966 as the date such member status was to become effective. No other change affected petitioners' position as harness racing judges during the years they worked as such.

By letters dated October 16, 1981, petitioners applied, pursuant to subdivision c of section 41 of the Retirement and Social Security Law, for purchase of member credits for services rendered as harness racing judges prior to April 1, 1966. In reviewing these applications, the retirement system sought salary information from the Department of State, the agency which had jurisdiction over petitioners' alleged employer, the commission. The Department of State notified the retirement system, however, that petitioners were not on its payroll prior to April 1, 1966. Petitioners' applications were thereafter denied on the ground that their employment prior to April 1, 1966 was not public employment but, rather, was employment by the individual racetracks.

Petitioners filed requests for a hearing and redetermination. Since petitioners' applications were essentially the same, the matters were consolidated. After conducting a hearing, the hearing officer rendered a decision finding petitioners employees of the State and not employees of the individual racetracks to which they were assigned. Respondent Comptroller, however, overturned the determination of his hearing officer and denied petitioners' applications based upon his interpretation of section 2 and subdivision b of section 41 of the Retirement and Social Security Law. Petitioners then commenced this transferred CPLR article 78 proceeding.

Petitioners contend that since the commission had power of control over their conduct, they were employees of the State and entitled to retirement service credit. Respondents do not dispute the fact that the commission exercised sufficient control over petitioners to warrant a finding under common-law principles of the existence of an employee-employer relationship. Respondents instead contend that such power of control is of no moment in the instant case. Accordingly, respondents maintain that the case turns solely upon the pertinent provisions of sections 2 and 41 of the Retirement and Social Security Law.

Subdivision b of section 41 defines service eligible for retirement credit, *inter alia,* as:

"Allowable service. Only the following types of service shall be allowable in computing service credits:

"Government service."

"Government service" is defined in subdivision 11 of section 2 as:

"Paid service as follows:

"a. Service as an officer or employee of an employer".

"Employer" is defined as: "The state, a participating employer, and any other unit of government or organization obligated or agreeing, under this article, to make contributions to the retirement system on behalf of its employees (Retirement and Social Security Law, § 2, subd 8)."

Respondents contend that the language of these statutes requires that a person seeking retirement service credit must satisfy two separate requirements. Specifically, he must demonstrate that he was *both* a public employee and compensated from the public treasury. Respondents thus argue that since petitioners were not paid from the public treasury prior to April 1, 1966, they were not State employees at that time eligible for retirement service under the statute (see *Matter of Barnett v Levitt,* 66 AD2d 980).

Although this argument seems rational on its face, it is lacking when the pre-April 1, 1966 and present compensation structure for payment of harness racing judges is considered. From April 1, 1966 to the present, harness racing judges have been paid by the State, but the State is then reimbursed by assessment against each racing association or corporation (9 NYCRR 4105.4). The separate racing associations or corporations are, therefore, still ultimately responsible for compensation of harness racing judges even though the physical check is written and distributed by the State. To follow the concept espoused by respondents, i.e., that to be in public service one must be paid by the public, is thus incongruous with the actualities of the pre-April 1, 1966 and present harness racing judges' compensation structure. Under the present framework, the judges' compensation is not ultimately derived from public

funds; yet, no one questions the racing judges' status as State employees eligible for retirement service credit.

The statute in question says "paid service" rather than "paid service *paid by the state*" or paid service paid by any other specific party (see *Matter of Shea v Falk,* 10 AD2d 142, 143-144, affd 8 NY2d 1071; cf. *Matter of Catena v New York State Employees' Retirement System,* 91 AD2d 1138). As this court noted in an analogous case, "[t]he omission by the Legislature of the four [*sic*] words 'and paid by the state' would seem to cry aloud that the Legislature did not intend any such limitation upon eligibility" (*Matter of Shea v Falk, supra,* p 144). This being the case, we conclude that the Comptroller's determination was unreasonable and irrational. The determination should, therefore, be annulled, without costs, and the matter remitted to the Comptroller for further proceedings not inconsistent herewith.

MAIN, MIKOLL, YESAWICH, JR., and WEISS, JJ., concur.

Determination annulled, without costs, and matter remitted to the Comptroller for further proceedings not inconsistent herewith.